OPINION
Attorney Dwight Washington appeals from the judgment of the Greene County Common Pleas Court whereby he was ordered to pay the attorneys fees incurred by Urologic Physicians and Surgeons (hereinafter UPS) in defending a wrongful discharge action filed on behalf of Washington's client, Robert Criner.
In December 1997, Washington filed a complaint alleging that Criner had been wrongfully terminated by UPS without just cause. Washington alleged in the complaint that Criner had relied on promises of job security by UPS and that Criner's discharge "without notice or opportunity to submit evidence to the contrary is violative of our system of fairness and notice in violation of the public policy exception to the employment at will doctrine in Ohio." Washington requested that Criner be reinstated to his job by UPS and that it be required to pay him $200,000 in punitive damages.
UPS answered and denied that Criner was discharged improperly. It also counterclaimed for $210 in compensatory damages for money it alleged Criner stole from UPS. It also sought punitive damages.
The trial court granted the defendant's summary judgment motion finding that the evidence demonstrated that the defendant had never promised Criner continued employment. The trial court found the evidence was undisputed that Criner was an at-will employee and that he had failed to present a triable issue that any exception to that employment status existed because of an implied contract of employment, promissory estoppel, or because the discharge was in violation of public policy.
Urologic then sought attorneys fees pursuant to R.C. 2323.51 contending that Washington filed the lawsuit when the suit was not warranted under existing law nor could it be supported by a good faith argument for an extension, modification, or reversal of existing law. In recommending that attorneys' fees be awarded the magistrate stated the following:
 The initial decision of whether a party's conduct was frivolous requires a factual inquiry. Lable v. Flowers (1995), 104 Ohio App.3d 227, 233. The second prong of the inquiry however, requires a purely legal analysis. Id. There has been no serious contention that Plaintiff's "obvious" intention in bringing this case was to merely harass or maliciously injure Defendant. Plaintiff's counsel is correct that the employment at will doctrine has eroded to some extent in recent years. Plaintiff's memorandum in opposition to the summary judgment cited a number of cases in support of his legal theories. However, Plaintiff's arguments were each considered and rejected by the Trial Judge. While Defendant's manner of terminating Plaintiff might very well offend the sensibilities of some in that Plaintiff felt he was not afforded the opportunity to "clear his name," his discharge simply does not fit any of the current exceptions to the employment-at-will doctrine. In addition, current Ohio case law does not suggest that the appellate courts are on the verge of abandoning the employment-at-will doctrine or enlarging the scope of exceptions to allow such claims as Plaintiff's.
The trial court adopted the magistrate's recommendation and awarded defendant $5952.40 in fees. The counterclaim was voluntarily dismissed and this appeal followed.
The facts developed by deposition are essentially as follows: Criner was hired on October 7, 1996 as a clinical technician by UPS. Criner testified he was hired with the understanding he would continue as a UPS employee indefinitely if he completed the 90 day probation period successfully.
Criner testified he enjoyed his work and the physicians, Drs. Pence and Humphrey, seem pleased with his work. Criner said the doctors often praised his work performance and even explained where he would be working when UPS moved into new quarters. Criner admitted no one at UPS ever expressly promised him continued employment but that he believed he would continue to work at Urologic for years to come. (Tr. 31-36). Criner testified that he turned down three job offers while employed at UPS because he was happy at UPS. (Tr. 39-41).
Criner testified he met with Drs. Pence and Humphrey on August 28, 1997 after work. He said they asked him how he enjoyed his job and he told them he liked it very much and had turned down three job offers. Criner said Dr. Pence told him they were very happy with his work but did not want him answering the phone anymore as they had hired someone to do that task.
Bonnie Stiffler, medical coordinator at UPS, and Karen Eckert, office manager, both testified that Criner failed to cooperate with other office employees, was rude to patients, gave medical advice over the phone to patients, and did not properly account for seven medical co-payments of patients. Karen Eckert testified a missing co-pay fee slip was found in Mr. Criner's desk.
Dr. Jack Pence testified that he was generally pleased with Robert Criner's job performance and even approved a bonus for him after his first year anniversary with UPS. Dr. Pence testified that he and Dr. Humphrey did discuss with Criner a number of complaints made by officer staff, including poor cooperation with employees, rudeness to patients, and improper medical advice over the phone to patients. Dr. Pence testified that Criner received a salary bonus just like the other employees of UPS. Dr. Pence stated that Criner was terminated because Criner was suspected of misappropriating the seven $30 co-payments and this was what "broke the camel's back."
Urologic offered in evidence a letter sent by its counsel Charles Stier, to Criner on September 26, 1997. In the letter, Stier confirms a previous telephone call to Criner informing him that he was being terminated for among other reasons, an apparent misappropriation of funds and irregular procedures concerning fee tickets.
Mr. Washington responded to Stier's letter indicating that he believed his client had been unjustly discharged and that his client would cooperate in a police investigation and submit to a polygraph regarding the missing money and fee slips.
In his sole assignment of error, Washington contends the trial court erred in finding that he had filed a frivolous lawsuit and that UPS should be awarded fees.
The general rule in Ohio is that "unless otherwise agreed, either party to an oral agreement may terminate the employment relationship for any reason which is not contrary to law." Mers v. Dispatch Printing Co.
(1985), 19 Ohio St.3d 100, 103. There is a strong presumption in favor of an at-will contract unless the terms of the contract or other circumstances clearly manifest the parties' intent to bind each other.Henkel v. Educ. Research Council (1976), 45 Ohio St.2d 249, 255. The Ohio Supreme Court has held, subject to the exceptions described, that the right of an employer to terminate an employee's employment for any cause at any time is absolute and cannot be limited by principles that protect persons from gross or reckless disregard of their rights, or from willful, wanton, or malicious acts done intentionally with insult, or in bad faith. Mers, 19 Ohio St.3d at 105.
The elements of an implied employment contract are the same elements as an express employment agreement; there must be a definite offer, acceptance, and consideration. Garenz v. Nordson Corp. (1991),68 Ohio App.3d 149. An implied contract is a contract inferred by a court from the circumstances surrounding the transaction, making it a reasonable or necessary assumption that a contract exists between the parties by tacit understanding.
Promissory estoppel applies to employment contracts and is a quasi-contractual or equitable doctrine designed to prevent harm resulting from the reasonable and detrimental reliance of an employee upon the false representation of his employer. Karnes v. Doctors Hospital
(1990), 51 Ohio St.3d 103, 142. A promise of future benefits or career opportunities without a specific promise of continued employment is not sufficient to support a promissory exception to the employment at-will doctrine. The courts have held that a promise of job security, discussions of future career development, with the employer, or praise with respect to job performance, do not in themselves invoke the promissory estoppel exception to the employment at-will doctrine. Wing v.Anchor Media (1991), 59 Ohio St.3d 108, 110-111. Positive feedback from superiors regarding performance is insufficient to alter at-will status.Schwartz v. Comcorp. Inc. (1993), 91 Ohio App.3d 639.
The third common law doctrine enables an employee to recover for a breach of contract where the employer has violated a covenant of good faith and fair dealing implied in all contracts as a matter of law. Conceptually, the covenant theory requires that contract rights be exercised in a manner that does not violate the covenant. Thus, even though an employer has the right to terminate an at-will contract for any reason, good or bad, or for no reason at all, the employer has a duty not to exercise this right in bad faith or unfairly. Perritt, The Future ofWrongful Dismissal Claims: Where Does Employer Self-Interest Lie?
(1989), 58 U.Cin.L.Rev. 397.
Professor Perritt points out in the article that under the broadest view of this doctrine, a dismissed employee need only show an employment relationship existed, the employment was terminated, and some aspect of the termination was unfair or in bad faith. Professor Perritt points out that the implied covenant doctrine enjoyed brief popularity, but as the more traditional and circumscribed implied in fact contract, and public policy tort doctrines were developed, the implied covenant doctrine declined in importance.
As of 1989, California, Massachusetts and Montana were the only states that relied heavily on the implied covenant as the primary wrongful dismissal doctrine. Perritt at 421. On August 8, 1991, the commissioners of the Uniform State Laws Commission approved the Model Employment Termination Act ("META") as a model law. The act would eliminate all common law causes of action arising out of an employee's termination in return for a statutory proscription against wrongful discharge except for "good cause." Legislatures in at least 13 states have adopted the Model Employment Termination Act. See, LSC Research Memorandum R-120-2483.
The Ohio Supreme Court has held that clear public policy warrants an exception to the employment at-will doctrine when an employee is disciplined for a reason which is prohibited by statute. Greeley v. MiamiValley Maintenance Contractors, Inc. (1990), 49 Ohio St.3d 228. Clear public policy sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly, but may also be discussed as a matter of law based on sources such as the U.S. and Ohio Constitutions, administrator rules and regulations, and the common law. Painter v. Graley (1994),70 Ohio St.3d 377.
Some courts have attacked the perceived inequities of the employment at will doctrine by creating a "malice and bad faith" exception sounding in tort or "an implied covenant of good faith and fair dealing" sounding in contract and/or tort. Ohio Courts have not yet gone that far. Kulch v.Structural Fibers, Inc. (1997), 78 Ohio St.3d 134, 161. Sheets v.Rockwell Int'l Corp. (1990), 68 Ohio App.3d 345; Anders v. SpecialityChem. Resources, Inc. (1997), 121 Ohio App.3d 348. But see, Wells v.Ormet Corp. (March 17, 1999), Monroe App. No. 798, unreported.
In Wells, the Monroe County Court of Appeals reversed the trial court's grant of a motion to dismiss where the complainant alleged he was discharged in violation of a clear public policy when he as a member of management answered a question in a way that favored the laborer's position at a grievance hearing. Judge Vukovic wrote the following on behalf of the appellate court:
 The public policy in the case sub judice consists of various established interests of society as a whole. These broad societal interests include a fair workplace, truthful grievance proceedings, job stability for long-term employees, and economic productivity. There is a clear public policy supporting the aforementioned interests, the violation of which is of similar import to the violation of a statute. The adoption of such a policy exception to employment-at-will adequately inures to the benefit of the general public.
In Fawcett v. G.C. Murphy and Co. (1976), 46 Ohio St.2d 245, the Ohio Supreme Court unanimously rejected the proposition urged on them by the plaintiff that the right of employers "to terminate employment at will for any cause, at any time whatever, is not absolute, but limited by principles which protect persons from gross or reckless disregard of their rights and interests, wilful, wanton or malicious acts or acts done intentionally, with insult, or in bad faith." Id., at 249. The Fawcett
Court reiterated its conclusion, articulated in the 1972 decisionAnderson v. Minter (1972), 32 Ohio St.2d 207, that "malice makes a bad case worse, but does not make wrong that which is lawful." Fawcett, at 250.
In the years between Fawcett and Mers there were some signs that some Ohio judges were ready, indeed eager, to reevaluate Fawcett with an eye to incorporating a "good faith" or "fundamental fairness" standard into Ohio employment law. Ohio Employment Law, Siegel and Stephen (2000 Ed) at § 4.11 pp. 153, 154. Indeed Justice Douglas, as an appellate judge, suggested that the "doctrine of fundamental fairness" should be considered in some situations. Helle v. Landmark, Inc. (1984),15 Ohio App.3d 1, 14. See also, Bolling v. Clevepak Corp. (1984),20 Ohio App.3d 113.
Whether conduct is warranted under existing law or can be supported by a good faith argument for extension, modification, or reversal of existing law is a question of law, peculiarly within the competence of an appellate court. Lable Co. v. Flowers (1995), 104 Ohio App.3d 227. See also, Tomb Assoc. Inc. v. Wagner (1992), 82 Ohio App.3d 363.
Our review of the evidence satisfies us that the trial court appropriately granted UPS summary judgment on Criner's complaint seeking damages and reinstatement for an alleged wrongful discharge. There was no evidence that UPS expressly or impliedly promised that Criner would have continued employment in exchange for a promise that Criner not seek employment elsewhere. Criner failed to demonstrate that UPS discharged him in violation of public policy as that has presently been recognized by the Ohio legislature or the Ohio Supreme Court.
The evidence is undisputed that Criner was terminated for allegedly stealing his employer's funds with no opportunity to address this serious accusation. This certainly would be a breach of an employer's duty of good faith and fair dealing to an employee were Ohio to recognize such a cause of action.
The Ohio Supreme Court has not specifically revisited this issue sinceFawcett v. G.C. Murphy and Co., supra. We cannot say that counsel's arguments for extending, modifying, or reversing Ohio's existing law regarding the implied contract of fair dealing and good faith was frivolous conduct under the provisions of R.C. 2323.51. Accordingly, the appellant's assignment of error is Sustained. The judgment of the trial court will be Reversed.
 ______________________ BROGAN, J.
GRADY, P.J., and YOUNG, J., concur.